RECEIVED

AUG 25 2025

**Exhibit K**

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

Medicaid requirements and policy excerpts showing payments may not be suspended without verified allegations of fraud



SCANNED

AUG 2 5 2025

U.S. DISTRICT COURT ST. PAUL



CENTERS FOR MEDICARE & MEDICAID SERVICES
**CENTER FOR PROGRAM INTEGRITY**

## Medicaid Payment Suspension Toolkit

Section 6402(h)(2) of the Affordable Care Act (ACA) amended section 1903(i)(2) of the Social Security Act to provide that Federal Financial Participation (FFP) in the Medicaid program shall not be made with respect to any amount expended for items or services furnished by an individual or entity to whom a State has failed to suspend payments under the plan during any period when there is pending an investigation of a credible allegation of fraud against the individual or entity as determined by the State, unless the State determines that good cause exists not to suspend such payments. On February 2, 2011, CMS published a final rule implementing these new requirements with an effective date of March 25, 2011.

This toolkit has been developed to reiterate the steps involved in suspending Medicaid payments based upon pending investigations of credible allegations of fraud to States and other program integrity stakeholders. The following chart outlines the general process States should be following when they receive an allegation of fraud:

**Receive an Allegation or Complaint of Fraud & Conduct a Preliminary Investigation**
- Sources include but are not limited to fraud hotline complaints, claims data mining, or patterns identified through provider audits, civil false claims, and law enforcement investigations.
- A state must review all allegations, facts, and evidence carefully in accordance with 42 CFR 455.14 and 455.15 to determine the validity of an allegation.

**Determine if an Allegation of Fraud is Credible**
- The state can conduct whatever due diligence it deems necessary, including informal consultation with other agencies and/or law enforcement to assess the credibility of an allegation of fraud.
- Per 42 CFR 455.2, allegations are considered to be credible when they have indicia of reliability and the state has reviewed all allegations, facts, and evidence carefully and acts judiciously on a case-by-case basis.

**Suspend Payments or Document a Good Cause Exception Not to Suspend**
- The state must suspend all Medicaid payments to a provider after it determines there is a credible allegation of fraud unless it has good cause not to suspend, or to suspend only in part.
- The state must follow the procedures outlined in the regulation to analyze and document good cause exceptions, which may also include an access to care determination.

**Refer the case to the Medicaid Fraud Control Unit (MFCU) or other appropriate law enforcement agency**
- Referral must be in writing and provided to the MFCU no later than the next business day after the suspension / good cause exception is enacted.
- Referral must comply with the CMS Referral Performance Standards.

**⮡ Follow Up**

- Payment suspensions are intended to be temporary in nature. They may be continued until the investigation and any associated law enforcement proceedings are completed.
- On a quarterly basis, the state must request a certification from the MFCU that a referral continues to be under investigation thus warranting the continuation of the payment suspension. Further, the State should conduct ongoing monitoring of a suspension to determine if there is a basis to exercise good cause to lift the suspension.

## Frequently Asked Questions:

**Q1. Can State Medicaid agencies share potentially helpful information with their MFCUs without following the requirements in the rule regarding documentation and timing of the referral of a credible allegation of fraud?**

**A1.** Although formal referrals from State agencies to MFCUs that involve credible allegations of fraud must meet the requirements set out in the final rule, CMS recognizes that States may need to consult and/or exchange information with their respective MFCUs prior to making a formal referral of fraud.

**Q2. When communicating with its MFCU, how can a State mitigate potential confusion between making a formal referral that necessitates a payment suspension versus merely sharing intelligence about concerns regarding a provider(s)?**

**A2.** States may wish to use the term "provider notice" to convey information of a strictly "FYI" nature to distinguish these discussions from formal referrals to a MFCU for purposes of payment suspension.

**Q3. May a State rely on its MFCU to determine if an allegation of fraud is credible?**

**A3.** Pursuant to 42 CFR 455.23(a), the State Medicaid agency must determine the credibility of an allegation of fraud, but the regulation does not specify or limit who, or what other agency, the State Medicaid agency may consult, or gather information from, to make its appraisal. We recognize that the process to determine whether an allegation of fraud is credible may vary among States, but we do not want to limit a State's due diligence process or preliminary investigations with respect to its assessment of credibility, and defer to States to apply the principles of careful review and judicious action to determine whether an allegation or complaint rises to a credible allegation of fraud. Once a State Medicaid agency determines an allegation of fraud is credible, it must submit a formal written referral to its MFCU regardless of whether the MFCU was consulted in assessing the allegation's credibility.

**Q4. When is a payment suspension triggered under section 1903(i)(2)(C)?**

**A4.** A preliminary investigation in accordance with 42 CFR 455.14 to assess the validity of an allegation of fraud does not itself trigger a payment suspension. A payment suspension is triggered when the State determines that an allegation of fraud is credible in accordance with 42 CFR 455.23.

**Q5. Once a State verifies an allegation of fraud is credible, what should it do next?**

**A5.** A State is required to suspend payments to a provider unless the State has good cause not to suspend payments and follows the procedures required to document/demonstrate such good cause.
 A State is required to refer the suspected fraud to its MFCU or other law enforcement agency for further investigation in accordance with CMS's performance standards for suspected fraud referrals (https://www.cms.gov/FraudAbuseforProfs/Downloads/fraudreferralperformancestandardsStateagencytomfcu.pdf).

**Q6. When is a partial payment suspension warranted?**

**A6.** Generally, a payment suspension should apply to all of a provider's claims because it may be difficult to determine which claims are "clean" until the completion of an investigation and one purpose of a payment suspension is to build a type of escrow account from which any overpayments may be deducted when an investigation is concluded. However, the regulations at 42 CFR 455.23(f) provide States the flexibility to find that good cause exists to suspend payments only in part. Although CMS anticipates States will exercise partial payment suspensions sparingly, several regulatory bases

3

can potentially justify partial payment suspensions: (1) where suspension in whole would so jeopardize beneficiary access to items or services as to present a danger to life or health; (2) where an investigation is solely and definitively centered on only a specific type of claim in which case a State may determine it is appropriate to impose a payment suspension on only that type of claim; (3) where an investigation of a credible allegation of fraud is limited to a particular business unit or component of a provider such that a suspension need not apply to certain business units or components of a provider; or (4) where the State deems it in the best interests of the Medicaid program.

**Q7.  What should the State do if a MFCU accepts a fraud referral but does not want a provider's payments to be suspended because it may alert a provider to a pending investigation?**

**A7.** A law enforcement request that a State not impose a payment suspension so as not to compromise an existing investigation qualifies as good cause to not suspend under the regulations at 42 CFR 455.23(e)(1).  The State should get this request in writing and include the request in its file for purposes of annual reporting to the Secretary.

**Q8.  Is it acceptable to make a formal referral to the MFCU and delay the imposition of a payment suspension in order to give the MFCU time to evaluate the case to decide if the payment suspension should not be imposed?**

**A8.** No.  CMS recommends that the State and the MFCU communicate frequently regarding case development so that upon the State determining that an allegation of fraud is credible and making a formal referral to the MCFU, a payment suspension occurs unless the MFCU has already requested that a payment suspension not be imposed per 42 CFR 455.23(e)(1) or the State exercises one of the other good cause exceptions.  Good cause exceptions should be documented in the case file at the time of referral to the MFCU.

**Q9.  What should a State do if the MFCU will not provide any information to it in writing, including good cause exception notices, for fear that these could be subject to Freedom of Information Act (FOIA) requests and hinder the development or prosecution of fraud cases?**

**A9.** The regulations at 42 CFR 1007.9 require that when the MFCU accepts or declines a case referred by the State, the notification must be made in writing.  Further, the regulations at 42 CFR 455.23(g) require that the State maintain all materials documenting the life cycle of a payment suspension as well as each instance where a payment suspension was not imposed, imposed only in part, or discontinued for good cause.  CMS recognizes that, due to various constraints, law enforcement may not be able to provide any specific details with respect to matters for which it provides a certification of investigatory status.  We encourage States to work collaboratively with their MFCU to determine what level of documentation the MFCU can provide.  We also note that disclosures regarding pending law enforcement cases generally fall within exceptions to the requirements of the federal, and likely many or all State's, FOIAs.  In any event, States should keep detailed notes on all actions taken on a case to comply with the provisions of the regulation and for logical tracking of a case.

**Q10.  Is it acceptable for a MFCU to request a "blanket" good cause exception for all "credible allegation of fraud" cases referred by the State?**

**A10.** No.  Each case must be evaluated on its own merits to determine the appropriate course of action.  Once a State has determined that an allegation of fraud is credible, the State must suspend payments unless it determines that good cause exists not to suspend payments, or not to continue a previously imposed suspension, with respect to the specific individual or entity.

**Q11.  Should the State's memorandum of understanding with the MFCU include a process for payment suspensions?**

4

**A11.** Yes, the State and the MFCU should have written procedures on each agency's expectations and roles in implementing a payment suspension based on a credible allegation of fraud. The U.S. Department of Health and Human Services Office of Inspector General's MFCU performance standards includes a requirement that the memorandum of understanding between the MFCU and the State Medicaid agency meets current federal legal requirements as contained in law or regulation, including 42 CFR 455.21, "Cooperation with State Medicaid fraud control units," and 42 CFR 455.23, "Suspension of payments in cases of fraud."

**Q12. How long should a payment suspension last?**

**A12.** Payment suspensions are intended to be temporary in nature in order to stem the flow of Medicaid dollars to providers against whom there are credible allegations of fraud, during the pendency of the investigation, which includes any related proceedings. On a quarterly basis, the State is required to request a certification from the MFCU or other law enforcement agency that any matter accepted on the basis of a referral continues to be under investigation, thus warranting continuation of the payment suspension. A payment suspension will not continue after either of the following: the State or the prosecuting authorities determine that there is insufficient evidence of fraud by the provider, or legal proceedings related to the provider's alleged fraud are completed. States should conduct ongoing monitoring of payment suspensions to determine if there is a basis to exercise good cause to lift any suspensions.

**Q13. What should a State do if it believes a payment suspension would create an access to care issue for beneficiaries, and what factors should States consider when making access to care determinations?**

**A13.** In tandem with a State's responsibility to protect its and the federal fisc by suspending payments to providers upon determining a credible allegation of fraud, CMS also recognizes, and balances, the paramount importance of beneficiary access to care. States likewise should balance these potentially competing interests. The payment suspension regulation at 42 CFR 455.23(e) and 42 CFR 455.23(f) thus contemplate beneficiary access burdens as potential bases for good cause exceptions. For example, 42 CFR 455.23(e)(4) and (f)(1) specify that, credible allegations of fraud notwithstanding, bases to either not suspend payments, or to suspend payments only in part, may exist where beneficiary access to car is jeopardized because is a sole community physician, sole source of essential services, or the provider in question serves a large number of beneficiaries in a federally designated medically underserved area.

In making any decision relating to payment suspensions, the State Medicaid agency has an ongoing responsibility to ensure that beneficiaries have access to appropriate critical services and must balance ease of access to care against potential risks raised by the credible allegations of fraud that triggered the suspension. The State may consider certain factors to determine if there is enough of an access to care issue that it amounts to good cause not to suspend payments, but likewise should consider whether the circumstances raised by the credible allegations of fraud nevertheless continue to justify imposition of a payment suspension. A State should also revisit its decision should circumstances surrounding access change. Factors States may consider include, but are not limited to, the following:

1. Risk Assessment: Determine possible consequences of suspension.
   a. Risk of Closure. Assess likelihood of closure, number of patients/beneficiaries that would require similar or alternate care, type of care, and urgency of transition to another provider, timeframes for the transition, and estimate future utilization that will need to use alternate providers.
   b. Risk of Withdrawal from the Medicaid program.
      1. Assess likelihood of immediate Medicaid beneficiary abandonment, number of beneficiaries that would require alternate care, type of care, and urgency of placement.
      2. Assess likelihood of controlled Medicaid beneficiary discharge, number of beneficiaries that would require alternate care, type of care, and urgency of placement.

5

       3.     Assess likelihood of withdrawal and estimate future utilization that will need to use alternate providers.

    c.   Risk of selective restriction of services:  Assess likelihood and impact of any other scenarios, such as a decision by the provider to stop performing a particular procedure or service while continuing to provider other services.

2. **Risk Mitigation**

    a.  Determine availability of alternate providers

        1.     Determine the number and capacity of similar providers in the immediate region (city/county/metropolitan area) and estimate available capacity to provide alternate care of the same type in both the immediate timeframe and with adequate warning, e.g., in the case of controlled beneficiary discharge.  Determine timeframes for potential referrals and transitions.  Use the appropriate metrics for the provider, e.g. bed and census information for hospitals.

        2.     Determine the number and capacity of similar providers in the extended catchment area that can provide services on a short term basis with a small amount of additional provider effort, beneficiary inconvenience, or program cost.

        3.     Determine the number and capacity of other providers that could provide alternate care that, in the short term, would still meet the clinical needs of beneficiaries.

    b.  Determine available resources to assist beneficiaries

        1.     Identify State and local resources that can assist physicians and beneficiaries needing referral or placement for urgent or routine care.

        2.     Identify additional resources that could, in an emergency, be called upon to assist physicians and beneficiaries.

    c.  Determine additional actions to protect beneficiaries and protect program funds:  Identify any additional interventions that can or should be coordinated with the payment suspension to, most importantly, protect beneficiaries or, secondarily, protect program funds.  For example, it may be desirable to coordinate State oversight agency inspections or law enforcement intervention.

**Q14.  What other steps should a State consider taking when suspending payments based upon a credible allegation of fraud?**

**A14.**  The State should follow the steps outlined in the regulation at 42 CFR 455.23 for imposing a payment suspension and conducting the associated follow up. The State Medicaid agency likewise has an ongoing affirmative obligation to ensure appropriate beneficiary access to services.  Accordingly, States should regularly reassess the impact and effects of a payment suspension, and, balancing all interests, make any necessary adjustments to fulfill its obligations.  CMS also suggests that States take the following steps when imposing payment suspensions they determine may impact access to care:

1. Create a Communication Plan
    a.  Identify partners for coordinated action and detailed assessment of alternate resources.
    b.  Identify key individuals to contact to alert to be aware of possible disruptions and prepare a general message.
    c.  Identify additional individuals to notify in the event a potential scenario materializes and prepare messages for each potential scenario.
2. Create a Beneficiary Assistance Plan
    a.  Identify individuals to assist providers and prepare a message and plan to distribute if needed because of care disruption.  Prepare a distribution list to be used if needed.

      b.   Identify individuals or agencies to assist beneficiaries and prepare a message and plan to distribute if needed because of care disruption.  Prepare a distribution list to be used if needed.

      c.   Identify an ombudsman or other party for beneficiaries to contact if all other assistance fails.

3.   Develop a Monitoring Plan

      a.   Develop a plan for monitoring the potential movement of beneficiaries/patients to alternate providers where appropriate

      b.   Collect information regarding the ongoing delivery of necessary services

      c.   Monitor calls regarding access issues to affected area/beneficiary (if possible).

## Additional Resources

Section 6402(h)(2) of the Affordable Care Act: http://www.ssa.gov/OP_Home/ssact/title19/1903.htm

CMS-6028-FC:  http://www.gpo.gov/fdsys/pkg/FR-2011-02-02/pdf/2011-1686.pdf

42 CFR 455.23:  http://www.ecfr.gov/cgi-bin/text-idx?SID=b92034b7e375f51ef0a719a918e6da91&node=42:4.0.1.1.13.1.132.11&rgn=div8

CPI-CMCS Informational Bulletin on Suspension of Medicaid Payments Based upon Credible Allegations of Fraud: http://downloads.cms.gov/cmsgov/archived-downloads/CMCSBulletins/downloads/payment-suspensions-info-bulletin-3-25-2011.pdf

Fraud Referral Performance Standards: http://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/FraudAbuseforProfs/downloads/fraudreferralperformancestandardsStateagencytomfcu.pdf

**Date:** August 6, 2025

**To:**
MHCP – Provider Investigations
An Equal Opportunity Employer
PO Box 64982
Saint Paul, MN 55164

DHS,

This letter serves as a formal request for the **immediate reinstatement of suspended payments** to **Home Care Staffing** due to substantial harm caused to staff and clients, and the submission of verified evidence disproving any claims that warranted the hold.

We have now submitted **over 400 documents** as part of our response package, which includes:

- **Detailed service notes**
- **Accurate billing records**
- **Verified home visit logs**
- A **client-signed statement** from Jessica Conquest confirming that all billed services are accurate and necessary
- All **billing records for the dates in question**
- A **DocuSign copy** of the client statement delivered to **Investigator Ashley Staupe**
- 3 complete folders of supporting documentation, also **emailed directly to the investigator** for further review

These documents collectively demonstrate the **accuracy, necessity, and legitimacy** of the services provided to Ms. Conquest. The client has **never filed a complaint** and was recently re-housed successfully through our program. She remains appreciative and fully engaged.

We strongly emphasize that **all evidence supporting our innocence has been submitted in full.** The documentation includes every requested detail and confirms that services were delivered in accordance with program standards.

---

## The Harm Caused by the Payment Hold

The sudden stop-payment action has caused **severe operational and human harm,** including:

- **$80,000+ in frozen payroll,** affecting over **30 employees** who have not been paid for work already completed
- **Threats of legal action** from staff unable to meet personal obligations such as rent, bills, and childcare
- **Suspension of critical services** to dozens of clients who rely on our support to remain safely housed

- A significant breakdown in trust among both our team and vulnerable clients

Despite this disruption, we have **continued serving hundreds of clients**, maintaining professionalism and transparency throughout this process.

---

## Urgent Request for Reinstatement

In light of the following:

- The **submission of full evidence validating all billed services**
- The **client's written confirmation** of service delivery and satisfaction
- The **severe impact on our staff and clients**
- Our continued compliance and communication with the state

We respectfully request that **all payments be reinstated without further delay**. This is critical to maintaining staff operations, restoring services, and upholding the mission of housing stabilization that we are committed to fulfilling.

We are fully available for any follow-up and will continue to cooperate in full with the Department of Human Services.

Thank you for your attention to this urgent matter. Please note we have sent 7 different emails with copies of what we also mailed for evidence for your review

Sincerely,

*Twyla Martin*

**Home Care Staffing (HSS)**

360 Housing Stability

**Operations Manager/ Chief Executive Officer**

Office: (612)900-6528 | Fax: (651)305-0677

Address:1821 University Ave Suite 494 |Saint Paul, MN 55104

UMPI/PMI: A503645400



# DEPARTMENT OF HUMAN SERVICES

August 1, 2025

Twyla Elaine Leach
Home Care Staffing
1821 University Ave W #494
St. Paul, MN 55104

Certified and Regular Mail

### Notice of Payment Withhold
### Provider Number: 503645400; NPI: A503645400

Dear Twyla Elaine Leach:

The Minnesota Department of Human Services (DHS) Program Integrity Oversight Division (PIO) will withhold all Minnesota Health Care Programs (MHCP) payments for services provided by Home Care Staffing effective August 1, 2025.

**Basis for Action**

DHS determined there is a credible allegation of fraud for which an investigation is pending under the MHCP. DHS has reviewed claims mining data and determined that Home Care Staffing received reimbursement for Housing Stabilization Services for recipient Jessica J. Cronquist in excess of the maximum units allowed for each recipient receiving this service during the time period from January 1, 2024, through July 15, 2025. This overbilling scheme is consistent with a pattern of fraud identified by DHS and law enforcement being used by Housing Stabilization Services providers.

**Temporary Withholding**

The MHCP payment withhold will start August 1, 2025, and continue until DHS or a prosecuting authority determines there is insufficient evidence of fraud, or until legal proceedings related to the alleged fraud are completed.

Home Care Staffing has the right to submit written evidence to DHS explaining why payments should not be withheld. Mail your written evidence to the P.O. Box listed at the bottom of the page.

If Home Care Staffing is going to continue to provide services to MHCP recipients while it is not being paid by MHCP, you must notify PIO by August 11, 2025. To notify PIO, call the investigator below at 651-431-3911.

If Home Care Staffing is unable to continue providing services to MHCP recipients, it must:
- Notify recipients and employees about this change
- Assist the recipients in transitioning to providers of their choice
- Know that DHS is available to assist recipients with transitions to other providers.

Home Care Staffing
August 1, 2025
Page 2 of 5

Employees can transition to new organizations along with their clients. As an employer, Home Care Staffing is responsible for paying employee wages, regardless of whether DHS is paying it. Review your obligations and notify clients of their rights in the enclosed Home Care Bill of Rights.

If you have questions about this notice, require it in an accessible format, or need a reasonable accommodation for a disability, please contact Ashley Staupe at 651-431-3911, Ashley.A.Staupe@state.mn.us, or use your preferred relay service.

Program Integrity Oversight Division
Office of the Inspector General
Minnesota Department of Human Services

*Legal Authority:*
Minnesota Statutes, sections 256B.064, subd. 2(b) and 256B.0641
Minnesota Rules, parts 9505.0180, 9505.2231 and 9505.2160 to 9505.2245.
42 CFR section 455.23

Home Care Staffing
August 1, 2025
Page 3 of 5

## Minnesota Home Care Bill of Rights

### PER MINNESOTA STATUTES, SECTION 144A.44.
### TO BE USED BY ALL LICENSED COMMUNITY AND ASSISTED LIVING FACILITY HOME CARE SERVICE PROVIDERS.

#### Statement of Rights

A client who receives home care services in the community or in an assisted living facility licensed under chapter 144I has these rights:

1. To receive written information, in plain language, about rights before receiving services, including what to do if rights are violated;

2. To receive care and services according to a suitable and up-to-date plan, and subject to accepted medical or nursing standards and person-centered care, to take an active part in developing, modifying, and evaluating the plan and services;

3. To be told before receiving services the type and disciplines of staff who will be providing the services, the frequency of visits proposed to be furnished , other choices that are available for addressing home care needs, and the potential consequences of refusing these services; .

4. To be told in advance of any recommended changes by the provider in the service plan and to take an active part in any decisions about changes to the service plan;

5. To refuse services or treatment;

6. To know, before receiving services or during the initial visit, any limits to the services available from a home care provider;

7. To be told before services are initiated what the provider charges for the services; to what extent payment may be expected from health insurance, public programs, or other sources, if know; and what, charges the client may be responsible for paying;

8. To know that there may be other services available in the community, including other home care services and providers, and to know where to find information about these services;

9. To choose freely among available providers and to change providers after services have begun, within limits of health insurance, long-term care insurance, medical assistance,  other health programs, or public programs;

10. To have personal, financial, and medical information kept private, and to be advised of the provider's policies and procedures regarding disclosure of such information;

11. To access the client's own records and written information from those records in accordance with sections 144.291 to 144.298;

12. To be served by people who are properly trained and competent to perform their duties;

13. To be treated with courtesy and respect, and to have the client's property treated with respect;

*P.O. Box 64982 • St. Paul, MN • 55164-0982 • An Equal Opportunity Employer*

Home Care Staffing
August 1, 2025
Page 4 of 5

14. To be free from physical and verbal abuse, neglect, financial exploitation, and all forms of maltreatment covered under the Vulnerable Adults Act and the Maltreatment of Minors Act;

15. To reasonable, advance notice of changes in services or charges;

16. To know the provider's reason for termination of services;

17. To at least ten calendar days' advance notice of the termination of service by a home care provider, expect at least 30 days' advance notice of the service termination shall be given by a home care provider for services provided to a client residing in an assisted living facility as defined in section 144I.01, subdivision 7. This does not apply in cases where:

   (i) the client engages in conduct that significantly alters the terms of the service plan with the home care provider;

   (ii) the client, person who lives with the client, or others create an abusive or unsafe work environment for the person providing home care services; or

   (iii) an emergency or a significant change in the client's condition has resulted in service needs that exceed the current service plan and that cannot be safely met by the home care provider;

18. To a coordinated transfer when there will be a change in the provider services;

19. To complain to staff and others of the client's choice about services that are provided, or fail to be provided, and the lack of courtesy or respect to the client or the client's property and the right to recommend changes in policies and services, free from retaliation including the threat of termination of services;

20. To know how to contact an individual associated with the provider who is responsible for handling problems and to have the home care provider investigate and attempt to resolve the grievance or complaint;

21. To know the name and address of the state or county agency to contact for additional information or assistance;

22. To assert these rights personally, or have them asserted by the client's representative or by anyone on behalf of the client, without retaliation; and

23. Place an electronic monitoring device in the client's or resident's space in compliance with state requirements.

**IF YOU HAVE A COMPLAINT ABOUT THE AGENCY OR PERSON PROVIDING YOU HOME CARE SERVICES, YOU MAY CALL, WRITE, OR VISIT THE OFFICE OF HEALTH FACILITY COMPLAINTS, MINNESOTA DEPARTMENT OF HEALTH. YOU MAY ALSO CONTACT THE OMBUDSMAN FOR LONG-TERM CARE.**

**Office of Health Facility Complaints**
(651) 201-4201
1-800-369-7994
Fax: (651) 281-9796

P.O. Box 64982 • St. Paul, MN • 55164-0982 • An Equal Opportunity Employer

Home Care Staffing
August 1, 2025
Page 5 of 5

**Mailing Address:**
Minnesota Department of Health
Office of Health Facility Complaints
85 East Seventh Place, Suite 300
P.O. Box 64970
St. Paul, Minnesota 55164-0970

**Ombudsman for Long-Term Care**
(651) 431-2555
1-800-657-3591
Fax: (651) 431-7452
**Mailing Address:**
Home Care Ombudsman
Ombudsman for Long-Term Care
PO Box 64971
St. Paul, MN 55164-0971

Licensee Name:

_____

Telephone Number:

_____

Address:

_____

Name/Title of Person to Whom Problems or Complaints May be directed:

_____

For informational purposes only and is not required in the Home Care Bill of Rights text:

MN Statutes, section 144A.44 Subd. 2. **Interpretation and enforcement of rights.**
These rights are established for the benefit of persons who receive home care services. "Home care services" means home care services as defined in section 144A.43, subdivision 3. A home care provider may not require a person to surrender these rights as a condition of receiving services. A guardian or conservator or, when there is no guardian or conservator, a designated person, may seek to enforce these rights. This statement of rights does not replace or diminish other rights and liberties that may exist relative to persons receiving home care services, persons providing home care services, or providers licensed under Laws 1987, chapter 378. A copy of these rights must be provided to an individual at the time home care services are initiated. The copy shall also contain the address and phone number of the Office of Health Facility Complaints and the Office of the Ombudsman for Long-Term Care and a brief statement describing how to file a complaint with these offices. Information about how to contact the Office of the Ombudsman for Long-Term Care shall be included in notices of change in client fees and in notices where home care providers initiate transfer or discontinuation of services.

Home Care Staffing

1821 University Avenue #494

Saint Paul, MN 55104

Phone: 612-900-6528

Date: August 7, 2025

## NOTICE OF IMMEDIATE TERMINATION OF SERVICES

Dear Valued Client,

It is with deep regret that we must inform you that Home Care Staffing is no longer able to continue providing services effective immediately. Due to a sudden and unforeseen loss of staff and workers, we are unable to meet our obligations to deliver the care and support that you deserve.

We understand the serious impact this may have on you and your family, and we sincerely apologize for the hardship and inconvenience this situation creates.

To ensure you are able to continue receiving the care you need, we encourage you to transition to another provider as soon as possible. A complete and current list of approved providers can be found on the Minnesota Department of Human Services (DHS) website:

☞ https://mn.gov/dhs/

Please contact DHS or the provider of your choice directly to arrange continuation of services.

We thank you for the trust you have placed in Home Care Staffing and deeply regret that circumstances beyond our control have led to this decision.

Respectfully,

Twyla Leach
Home Care Staffing

1

## CLIENT/PARTNER AFFIDAVIT OF SERVICE DISRUPTION DUE TO DHS ACTION

State of Minnesota
County of _____Ransey_____

I, _____Khauzouafu Lee_____, being duly sworn, state as follows:

1. I was a client/referral source/partner of Home Care Staffing prior to August 2025.

2. On or about August 6, 2025, I was notified that services would be disrupted due to a suspension of Medicaid payments initiated by the Minnesota Department of Human Services (DHS), based on a public announcement regarding suspected fraud.

3. Prior to this announcement, I had every intention of continuing to receive services/work with Home Care Staffing.

4. The sudden suspension of payments and the DHS public statement caused me to withdraw/discontinue services because:
   - I was unable to receive the care/services as promised.
   - The announcement damaged my confidence in Home Care Staffing's ability to continue operations.
   - I was forced to seek services from another provider immediately to ensure continuity of care.

5. But for the DHS suspension and public announcement, I would have remained with Home Care Staffing.

6. This service disruption caused me personal hardship and created unnecessary instability in my care/services.

I declare under penalty of perjury under the laws of the State of Minnesota that the foregoing is true and correct to the best of my knowledge.

Dated this __18__ day of __August__, 2025

_____
Signature

1

# Twyla Martin

Owner/Director – Home Care Staffing
UMPI: A503645400
Email: Twyla@360housingstability.org

~~Date: August 9, 2025~~

To:
Centers for Medicare & Medicaid Services (CMS)
Center for Program Integrity
7500 Security Boulevard
Baltimore, MD 21244

**Re: Federal Appeal – Unlawful Medicaid Payment Suspension Without Credible Allegation of Fraud**

Dear CMS Center for Program Integrity,

I am submitting this federal appeal on behalf of **Home Care Staffing (UMPI: A503645400)** regarding the Minnesota Department of Human Services' suspension of Medicaid payments against my agency. This suspension is unlawful under federal law and requires immediate intervention by CMS.

The suspension was imposed **without notice of a credible allegation of fraud** and based solely on "data mining patterns." Federal regulation **42 C.F.R. § 455.23** explicitly states that Medicaid agencies may suspend payments only where there is a **credible allegation of fraud supported by reliable evidence.** CMS has issued clear guidance that **data mining alone does not constitute credible evidence** and cannot be the sole basis for payment suspension.

**Grounds for Federal Appeal**
1. **Absence of Credible Allegation** – No fraud allegation supported by reliable evidence has been presented. DHS has provided no audits, law enforcement findings, or corroborating evidence to justify suspension.
2. **Due Process Violation** – Providers are entitled to written notice and a statement of reasons for suspension. DHS has failed to provide this, in violation of federal due process protections.
3. **Unlawful Withholding of Payments** – The continued suspension without credible allegation directly violates **42 C.F.R. § 455.23** and results in material financial harm to my agency, employees, and Medicaid recipients.

**Relief Requested**
- Immediate reinstatement of Medicaid payments to Home Care Staffing.
- Federal review of Minnesota DHS's suspension process for noncompliance with CMS regulations.
- Written disclosure of all evidence relied upon by DHS to justify suspension.
- Federal oversight to ensure state compliance with due process protections.

**Conclusion**
CMS's role in overseeing state Medicaid enforcement is vital to ensure providers are not unjustly penalized based on unsupported data analysis. This suspension is arbitrary, unsupported by credible evidence, and must be reversed under federal law.

I respectfully request that CMS intervene and order reinstatement of payments immediately. Please confirm receipt of this appeal and advise of next steps.

Respectfully,

Twyla Martin
Owner/Director – Home Care Staffing
UMPI: A503645400
Email: Twyla@360housingstability.org

Home Care Staffing
Date: August 18, 2025

To Whom It May Concern:

Home Care Staffing is a provider with a long-standing record of honesty, compliance, and integrity. We have consistently upheld Medicaid laws, cooperated fully with every investigation, and have never engaged in unlawful conduct or violations.

Despite this, our agency is currently being penalized based on allegations that have already been disproven. The consequences of this action have been devastating for our clients: payments have been halted, housing placements lost, vulnerable individuals forced back onto the streets, and preventable hospitalizations have occurred. This harm is ongoing, substantial, and in many cases irreversible.

As innocent providers, we should not be subjected to punitive measures that directly endanger the very individuals we serve. We respectfully request immediate relief and a comprehensive review of these actions so that essential services may resume without delay, preventing further harm to our clients.

Home Care Staffing remains fully committed to serving the community with integrity and compassion. We urge your urgent intervention to correct this injustice and protect the wellbeing of the people who depend on us.

Respectfully,


Twyla Martin
Owner/Director – Home Care Staffing